AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

FILED

AUG 21 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of

The residence located at ▓▓▓▓▓ St. Charles, MO 63303, and
any computers or electronic devices contained therein.

Case No.    4:19 MJ 1379 JMB

## APPLICATION FOR A SEARCH WARRANT

I, _____ Andrew Donohue _____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the _____ EASTERN _____ District of _____ MISSOURI _____, there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 29:501(c); 29:439(b) and (c); 18:1341 & 1343; 18:1956 & 1957; ▓▓▓ | Embezzlement of Union Funds; Filing False LM Reports and Maintaining False Union Records; Mail and Wire Fraud; Money Laundering; ▓▓▓▓▓▓ |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Donohue, Special Agent
*Printed name and title*

Sworn to before me via Face Time and signed electronically.

Date:   8/21/19

_____
*Judge's signature*

City and state:  St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Jennifer A. Winfield

## Affidavit in Support of an Application for a Search Warrant

I, Andrew Donohue, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.       I make this affidavit in support of an application for a search warrant for evidence located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **St. Charles, MO 63303 (SUBJECT PREMISES)**.

2.       The location to be searched is described in the following paragraphs and in Attachment A.  For the reasons detailed below, there is probable cause to believe that there is evidence of violations of  29 U.S.C. § 501(c), Embezzlement of Union Funds;  29 U.S.C. § 439(b) and (c), Filing False LM Reports and Maintaining False Union Records; 18 U.S.C. §§ 1341 & 1343, Mail and Wire Fraud; 18 U.S.C. §§ 1956 & 1957, Money Laundering; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ and conspiracy to commit the same, as further described in Attachment B, at the SUBJECT PREMISES.

3.       I am a Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Investigations - Labor Racketeering and Fraud (DOL-OIG/OI-LRF), and was previously employed as a Senior Investigator with the U.S. Department of Labor, Office of Labor Management-Standards (DOL-OLMS).  I have been employed within the DOL since September 2006 and am currently assigned to the DOL-OIG Detroit Field Office.

4.       I have graduated from the Criminal Investigator Training Program (CITP) and the Inspector General Investigator Training Program (IGITP) at the Federal Law Enforcement Training Center (FLETC).  I attended and participated in joint in-service sessions for DOL-OIG/OI-LRF agents and Federal Bureau of Investigation (FBI) agents, for training on the current criminal laws prohibiting labor racketeering and other criminal violations of Title 18 and Title 29 of the United Stated Code.  I have also received training in documentary and electronic evidence given by members of the Computer Crime & Intellectual Property Section (CCIPS) of the U.S. Department of Justice.

5.       During my years at the Department of Labor, I have conducted numerous investigations into criminal violations of both Title 29 and Title 18 of the United States Code. Through my training and investigative casework involving labor organizations, I am familiar with the operation, administration, and business practices of labor unions and the corporate employers with which they negotiate.

6.       I make this affidavit based upon personal involvement in the subject criminal investigation, including review of financial, property and business records, review of email communications, interviews of witnesses, the execution of search warrants, the seizure and review of physical and electronic evidence, and law enforcement surveillances.  I have also been provided with information and reports from other law enforcement agents and officials from the FBI and Internal Revenue Service – Criminal Investigations (IRS-CI).  This affidavit does not contain all of the facts developed to date in the underlying investigation and is being submitted for the purpose of establishing probable cause for the requested search warrant.

1

## Summary of the Relevant Labor Statutes

7.     The Labor-Management Reporting and Disclosure Act (LMRDA), also known as the Landrum-Griffin Act, is a Federal statute that regulates certain aspects of internal union affairs.  Labor organizations comprised wholly or in part of private sector employees are covered by the Act.  The LMRDA guarantees union members rights such as the right to participate in union meetings and vote in union elections.  The Act also contains reporting provisions that require unions to disclose information about their structure and financial condition (called LM Reports).  Section 206 of the LMRDA creates an affirmative obligation for union officials to maintain records that explain or clarify entries on the union's LM reports and allow the reports to be checked for accuracy and completeness.  The statute makes filing of a false LM report or false entries, including willful concealment, in union records a crime.  Finally, the LMRDA provides safeguards for protecting labor organization funds and assets through criminalizing the embezzlement of union funds or assets by any officer or employee of the organization.

## Summary of the Investigation

8.     Since 2015, I have been involved in a multi-agency investigation of the United Auto Workers (UAW), Fiat Chrysler Automobiles (FCA)
and other employers, business entities, and individuals involved in the American automobile manufacturing industry centered largely in Southeast Michigan.  To date, eight individuals have been convicted of crimes for their roles in criminal activity uncovered by the investigation.  Many of these charges and convictions involved UAW officials' improper receipt of things of value from FCA officials and others acting on their behalf.

9.     However, the investigation has more recently uncovered a multi-year conspiracy involving the most senior of UAW officials to embezzle, steal, and unlawfully and willfully abstract and convert UAW funds to purchase luxury items and accommodations for their own personal benefit.  The outlay of the funds was not properly approved, concealed from the view of the UAW members, and used for the personal benefit of the upper echelon of union officials who were elected to represent the members' best interests above their own.

10.     The investigation has shown that these officials (1) obtained fraudulent "approval" through the submission of vouchers that misrepresented payments as official business and concealed the true destination and purpose of the expenses

These schemes resulted in the UAW filing false LM reports with the U.S. Department of Labor by making material misrepresentations as to the true nature of the expenses, subsequent money laundering transactions, and mail/wire fraud activity involving the concealment and movement of the money.

## Background

2

*The UAW and its Structure*

11.     The UAW is a "labor organization" as defined in the LMRDA, with its headquarters based in Detroit, Michigan. The UAW represents hundreds of thousands of non-management workers employed in private industry at numerous locations in Michigan and across the United States. The UAW engages in contract negotiating sessions with FCA, Ford, GM, and dozens of other employers that establish collective bargaining agreements (CBA) covering wages, working conditions, and numerous related benefits for the rank-and-file UAW members.

12.     Like most unions, the UAW is a "tiered" organization. The UAW International Union is the union's parent body and is located within the Eastern District of Michigan (EDMI) at 8000 East Jefferson Avenue, Detroit, MI 48214. Colloquially, the union's headquarters is known as "Solidarity House" or "Solid House" amongst its members and may be referenced as such in this affidavit. Most rank-and-file UAW members belong to local unions, which generally are organized by either employer, plant, or geographic area. According to the UAW's website, UAW members belong to more than 600 local unions and are supported by Solidarity House and its nine regional offices.

13.     The UAW Regions are administrative arms of Solidarity House located across the United States. The UAW Region 5 Office (**REGION 5**) is located within the Eastern District of Missouri (EDMO) at 721 Dunn Road, Hazelwood, MO 63042. According to the union's website, UAW Region 5 covers 17 western states and has sub offices in Dallas, TX, Kansas City, MO, and Pico Rivera, CA. REGION 5 represents UAW members who work in the academia, auto parts, aerospace, and beverage container industries for employers like GM, Ford, Lear Corp., Lockheed, Raytheon, and Vought.

14.     Agents have learned that the UAW Region 5 Midwest States CAP Council (**MIDWEST CAP**) and Region 5 Southwest States CAP Council (**SOUTHWEST CAP**) operate within REGION 5's jurisdiction. The CAP councils are the UAW's "Community Action Programs." The MIDWEST CAP is located within the EDMO and co-located with REGION 5 at Region 5's headquarters at 721 Dunn Road, Hazelwood, MO 63042. The SOUTHWEST CAP is located within the Northern District of Texas (NDTEX) at 1341 W. Mockingbird Lane, Suite 301W, Dallas, TX 75247. According to the UAW Constitution, the CAP Councils are "designed to improve and enrich the quality of American life" and otherwise promote and engage in community activism. The UAW CAP councils are funded through "per-capita" tax payments derived from dues money collected by the UAW local unions and are subject to the same governance as Solidarity House and UAW locals. The UAW CAP Councils are "labor organization[s]" as defined in the LMRDA and file LM reports with the U.S. Department of Labor.

*The UAW's Governance*

15.     The UAW is governed by the UAW Constitution, which lays out the organization's objects, structure, officers, and framework. The UAW holds elections every four years to elect its officers. The officers include the President, Secretary-Treasurer, three (3) Vice Presidents, and nine (9) Regional Directors. These officers hold de facto positions on the union's International Executive Board (IEB), which is the highest authority in the UAW between

meetings of the International Convention of UAW Delegates. On occasion, the IEB issues guidance in the form of Administrative Letters. These letters serve as policy clarification or to fill in gaps in the governance of the union.

16. Both Federal Law and the UAW Constitution impute a fiduciary duty on union officers to manage the funds and property of the union solely for the benefit of its members. The UAW Constitution has a special section entitled the Ethical Practices Code (EPC), which prescribes the moral principles to which all UAW members and officials must adhere. Like the EPC, multiple Administrative Letters prohibit moral turpitude, self-dealing, the mere appearance of conflicts of interest, and leveraging union positions for personal advantage. Furthermore, the EPC states: "*Union funds are held in sacred trust for the benefit of the membership*." and *"No officer or representative shall accept "kickbacks," under-the-table payments, valuable gifts, lavish entertainment or any personal payment of any kind."*

17. The union's Financial Officers Manual discloses that the UAW operates on a "voucher system." This means that all "order[s] on the treasury" (aka check requests) must be attested to by two officers who can verify or "vouch" for these actions. The UAW's "voucher system" is also supported by a June 4, 1957, Administrative Letter issued by famed UAW President Walter Reuther. This letter indicates that the UAW adopted the "AFL-CIO's CODE OF MINIMUM ACCOUNTING AND FINANCIAL CONTROLS FOR AFFILIATES," which states in part, "All expenditures should be approved by proper authority under constitutional provision and be recorded and supported by vouchers; providing an adequate description of the nature and purpose of the expenditure sufficient for a reasonable audit by internal and independent auditors."

*UAW Officials*



20. Vance Pearson **(PEARSON)** is currently the Regional Director of UAW Region 5 and has been such since June 2018. This makes PEARSON one of the most senior officials in the UAW and a member of the IEB. In his position as Regional Director, PEARSON is responsible for representing the best interests of the tens of thousands of UAW members employed within Region 5. PEARSON has been an officer or employee of the UAW continually since 2002. In 2003, PEARSON was assigned to Region 5 as a servicing representative

4

responsible for collective bargaining, arbitrations, and organizing. For a time, PEARSON was third in command of Region 5 and reported to

**The Embezzlement and Fraudulent Approval Scheme**

*Palm Springs, California*

24. The investigation has revealed an embezzlement scheme whereby UAW officials hid their personal use of UAW money without any legitimate union business purpose. These UAW officials have intentionally and fraudulently concealed these personal expenses within the cost of UAW leadership and training conferences in order prevent their discovery by the government and the UAW membership.

25. The investigation has disclosed that the UAW controls multiple bank accounts located in the EDMI at JP Morgan Chase Bank N.A. This includes the union's checking account at JPMorgan Chase Bank Dearborn Branch listed at 14901 Ford Road, Dearborn, MI 48126 (ABA Routing # 072412927). Review of the union's books and records show that between 2014 and 2017, the union outlaid by check or wire, over $1 million to the Renaissance Palm Springs Hotel (**RPSH**) in Palm Springs, CA. Listed below is a selection of those checks and wires:

| Check Date | | Payee | Check Amount |
|---|---|---|---|
| 8/15/2014 | | RPSH | $175,000 |
| 1/5/2015 | | RPSH | $150,000 |

5

| 6/8/2015 | | RPSH | $245,000 |
| 5/26/2016 | | RPSH | $175,000 |
| 12/8/2016 | | RPSH | $80,000 |
| 1/18/2017 | | RPSH | $25,000 |
| 6/7/2017 | | RPSH | $175,000 |
| | | **TOTAL** | **$1,025,000** |

26.     The union's publicly available LM-2 Reports filed with the U.S. Department of Labor for 2014 through 2017 represent that the destination of those expenditures was the RPSH, a hotel in Palm Springs, CA. Furthermore, the UAW discloses that the purpose of the payment was deposits and expenses associated with the UAW's 2014 to 2018 Region 5 Leadership Conference (**Region 5 Conference**).

27.     Agents have learned that the Region 5 Conference is an event that traditionally occurs each January in Palm Springs, CA. Ostensibly, the purpose of the Region 5 Conference is to train local union leadership on issues that affect them, such as bargaining, grievance adjudication, and the proper administration of the union. According to the "Call Letter" (the official announcement of the conference) issued by the UAW, the Region 5 Conference typically lasts between 3 and 5 days. However, UAW officials, including           PEARSON,           and others would spend weeks and/or months living in Palm Springs enjoying an extravagant lifestyle paid for with UAW funds.

28.     Agents obtained and reviewed the UAW Payment Request Forms (commonly known as "vouchers") that requested the disbursement of UAW funds and provided the underlying supporting documentation related to the expenses. Agents found that the vouchers were authorized/approved by           PEARSON, and           or some combination thereof depending on the instance. Review of the vouchers disclosed that the payments listed above were "deposits" or advance payments made to the RPSH for the Region 5 Conference. Cursory examination of the agreement reflected expenses one might expect to see when conducting a legitimate training conference. That is to say, the securing of a block of hotel rooms, meeting rooms, and audio-visual fees. However, upon an in depth review, agents also noted language in the contracts regarding the creation of a "Master Account," which provided "UAW authorized staff may sign for payments (charges) at local restaurants, golf courses, and additional retail outlets, and the Hotel will post these charges to their Master Account."

29.     Agents contacted the RPSH and spoke with           who indicated that the UAW had a "Direct Bill" or "Master Account" arrangement with the hotel. This allowed senior UAW officials to deposit funds up-front and run a tab for retail, grocery, meal, liquor, cigar, and other entertainment expenses at vendors in and around Palm Springs. The RPSH would satisfy those debts using funds from the UAW's deposit.           also stated that a significant portion of UAW funds was used to pay local companies for offsite housing including villas with private pools and condominiums in gated neighborhoods for select UAW officials. The investigation has established that the conspirators used the Master Account as a way to conceal the embezzling of union funds for their own personal use.

6

30.    Armed with this knowledge, agents obtained not only records from the RPSH, but also from the vendors paid by the RPSH on the UAW's behalf. Agents noticed many expenses that are inconsistent with the legitimate conduct of union business, were not disclosed to the UAW's HQ at Solidarity House, and did not appear on the union's LM reports. Records show over $600,000 of the money paid by UAW to RPSH was used by the hotel to satisfy debts incurred and arranged by senior UAW officials at Holly Homes, Desert Princess Rentals, LG Prime Steak House, Johnny Costa's Ristorante, Las Casuelas, Indian Canyons Golf Resort, Gary's Sales, and the Tinder Box, between 2014 and 2017. In many, if not all instances, PEARSON, and ▆▆▆ were the individuals that made the underlying billing arrangements. Agents also noted that these expenses were concealed in line items on the RSPH master invoice called "off-site rooms" and "off-site functions" or variations thereof.

31.    Agents determined that through the RPSH, the UAW paid over $400,000 to Palm Springs area businesses Holly Homes, Desert Princess Rentals, and Home Cleaning Services of America between 2015 and 2017. Records and testimony disclosed that off-site condominiums and villas with private pools and hot tubs in gated communities were secured for individual high-ranking union officials, including ▆▆▆▆▆▆▆▆▆▆ PEARSON, ▆▆▆▆ and ▆▆▆▆▆▆▆ Agents noted that UAW email addresses assigned to ▆▆▆▆▆▆▆ and PEARSON ▆▆▆▆▆▆▆▆▆ discuss the villas and condominiums arrangements between 2015 and 2018. Agents found examples of ▆▆▆ PEARSON, and ▆▆▆ signing vouchers to the UAW requesting "deposit" payments to the RPSH even after they had been directly involved in making arrangements with Holly Homes, Desert Princess Rentals, and/or Cleaning Services of America. A selection of notable findings include:



a.    According to the official call letter, the 2014 Region 5 Conference took place between January 14-16, 2014 (3 days). However, records indicate individual villas were rented for ▆▆▆ and ▆▆▆▆▆ from December 27, 2013 to January 27, 2014 (31 days).

b.    According to the official call letter, the 2015 Region 5 Conference took place between January 5-9, 2015 (5 days). However, records indicate individual villas were rented for ▆▆▆ from about December 28, 2014 to January 31, 2015 (34 days); ▆▆▆▆▆▆ from about December 25, 2014 to January 31, 2015 (37 days); and ▆▆▆▆▆▆ from about December 25, 2014, to January 31, 2015 (37 days).

c.    According to the official call letter, the 2016 Region 5 Conference took place between January 11-15, 2016 (5 days). However, records indicate that a villa was rented at 67-740 S. Trancas, Cathedral City, CA for ▆▆▆▆ between December 24, 2015 and February 29, 2016 (67 days) at a total cost of over $11,000 to the UAW. A villa located at 29-296 W. Laguna, Cathedral City, CA was rented for ▆▆▆▆ between December 17, 2015 and March 31, 2016 (105 days) at a total cost of over $15,000 to the UAW. A villa located at 67-698 S. Natoma, Cathedral City, CA was rented for ▆▆▆ from December 28, 2015 to February 29, 2016 (63 days), at a total cost of over $10,000 to the UAW.

d.    According to the official UAW call letter, the 2017 Region 5 Conference took place between January 9-13, 2017 (5 days). Agents found that PEARSON executed a

rental agreement for the property located at 67-619 S. Laguna, Cathedral City, CA for December 1, 2016 to April 1, 2017 (about 121 days). Desert Princess Rentals recorded the inhabitant of that address as ▆▆▆▆▆ The total cost of the single villa was over $20,000 and was satisfied with funds from the UAW.

32.    Between 2016 and 2018, Agents learned that over $60,000 of UAW funds were used for meals at Palm Springs area restaurants LG Prime Steak House and Johnny Costa's Ristorante paid via the master billing arrangement. Ostensibly, these meals were falsely represented to be part of the Region 5 Conferences. In fact, some of these meals took place far outside the dates of the conferences. Like the villa expenses, the subject vouchers submitted to Solidarity House make no mention of the meals. Furthermore, investigating agents found no records detailing the business purpose of the meals and those in attendance as is required by the LMRDA to substantiate the expenses. Agents obtained underlying receipts from the vendors and found multiple instances of the meals taking place outside the official conference dates and the significant purchases of wine and liquor. For example, the call letter indicates that the 2017 UAW Region 5 Conference took place between January 9-13, 2017. However, agents found that the following meals were paid for with UAW funds under the fraudulent claim that the meals related to the Region 5 Conference:

a.    An LG Prime Steak House invoice reflecting a December 31, 2016 (New Year's Eve) meal totaling over $6,599.87, which included $1,942 in liquor, $1,440 in wine, and what appears to be an $1,100 tip. The bill also indicates the purchase of four (4) bottles of Louis Roederer Cristal Champagne totaling $1,760. The Louis Roederer website indicates that Cristal Champagne is the company's flagship brand, which was originally created "in 1876 to satisfy the demanding tastes of [Russian] Tsar Alexander II."

b.    A Johnny Costas Ristorante invoice from December 29, 2016, totaling $2,079. This meal included the purchase of multiple glasses of Crown Royal XR (Extra Reserve) at $40 a glass, a drink that Crown Royal Distillery describes as "the rarest in our extra rare whiskey series."

c.    Another Johnny Costas Ristorante invoice from January 3, 2017, totaling $2,292.65. This meal included the purchase of multiple glasses of Crown Royal XR and Macallan 18-Year-Old Scotch at $40 a glass.

d.    Another LG Prime Steakhouse receipt from January 5, 2017, reflect the outlay of $4,827.77. Notable purchases include glasses of 17-year-old Macallan Scotch at $25 per glass and eight (8) bottles of Duckhorn 3 Palms Merlot (aka wine) purchased at $180 a bottle totaling $1,440.

33.    Agents determined that through the RPSH master billing arrangement, the UAW paid the Indian Canyons Golf Resort over $80,000 between 2015 and 2018 for purchases made by a set of people using the *nom de guerre* of the '▆▆▆▆▆' Indian Canyons Golf Resort records indicate that expenses included food and beverage, green fees, club rental, and retail purchases. More often than not, these expenses occurred outside the official dates of the yearly conferences. Additionally, many of these invoices were signed by ▆▆▆▆, PEARSON, and ▆▆▆▆ Again, Agents note the absence of disclosure of the golf and merchandise expenses

8

to Solidarity House on vouchers submitted to secure funding.  Agents also found examples of expenses that on their face are inconsistent with the legitimate conduct of union business.  For example:

    a.    A purchase of over $3,000 at the Indian Canyons pro shop on December 29, 2014. The invoice appears to bear the signature of       Purchases include men's and women's shirts, jackets, hats, visors, and sunglasses.

    b.    An almost $900 purchase at the Indian Canyons pro shop on January 2, 2016. The invoice appears to bear the signature of      Purchases include, hats, gloves, a golf bag, jackets, socks, and "fashion shorts."

    c.    A purchase of over $2,000 at the Indian Canyons pro shop on December 31, 2016. The invoice appears to bear the signature of PEARSON and contains the hand written name "Vance Pearson" directly under the signature.  Purchases include polo shirts, shoes, jackets, hats, and "Men's Fashion Short[s]."

    34.    Agents reviewed Indian Canyon's Golf Resort records and noted significant purchases of green fees billed to the      The records also indicate that greens fees were for golf played outside the dates of the official conference dates.  For instance in 2015, the official Region 5 Conference took place between January 5 and 9, 2015.  Indian Canyon's records indicate that 107 18-hole rounds of golf (or 1,926 holes) were paid for by the UAW outside the conference dates.  Green fees were secured as early as December 29 and as late as January 29 at a total cost of almost $9,000 to the UAW membership:

| Date | Golfers | $ per Round | Holes of Golf | Running Total | Total Cost | Running Total |
|------|---------|-------------|---------------|---------------|------------|---------------|
| 12/29/2014 | 10 | $74 | 180 | 180 | $740 | $740 |
| 12/30/2014 | 12 | $74 | 216 | 396 | $888 | $1,628 |
| 1/2/2015 | 9 | $84 | 162 | 558 | $756 | $2,384 |
| 1/3/2015 | 10 | $84 | 180 | 738 | $840 | $3,224 |
| 1/4/2015 | 11 | $84 | 198 | 936 | $924 | $4,148 |
| 1/13/2015 | 12 | $84 | 216 | 1152 | $1,008 | $5,156 |
| 1/14/2015 | 8 | $84 | 144 | 1296 | $672 | $5,828 |
| 1/15/2015 | 3 | $84 | 54 | 1350 | $252 | $6,080 |
| 1/17/2015 | 8 | $110 | 144 | 1494 | $880 | $6,960 |
| 1/18/2015 | 2 | $84 | 36 | 1530 | $168 | $7,128 |
| 1/19/2015 | 4 | $84 | 72 | 1602 | $336 | $7,464 |
| 1/24/2015 | 2 | $84 | 36 | 1638 | $168 | $7,632 |
| 1/25/2015 | 6 | $84 | 108 | 1746 | $504 | $8,136 |
| 1/27/2015 | 3 | $84 | 54 | 1800 | $252 | $8,388 |
| 1/29/2015 | 7 | $84 | 126 | 1926 | $588 | $8,976 |

107

35.     Agents determined that through the RPSII, the UAW paid almost $50,000 for cigar and tobacco related expenses between 2014 and 2018 at The Tinder Box in Palm Springs, CA and Gary's Sales in Parker, AZ.  Like the expenses detailed above, no mention of cigars was made to Solidarity House in securing funding for the Region 5 Conferences.  Notable items include:

a.      A 2014 Tinderbox invoice issued to ▮▮▮▮▮▮▮▮▮▮▮▮▮ for an over $1,800 purchase that included four (4) stainless steel table cutters at $72.50 a piece for a total of $285 and four (4) 100 count humidors at $187.50 each for a total of $750.

b.      The November 2016 Gary's Sales invoice issued to "UAW C/O VANCE PEARSON" for an over $13,000 purchase that included 16 boxes of Diamond Crown Churchills at $243 a box (totaling $3,888) and 10 boxes of Ashton Monarch Tubos cigars at $274.50 a box (totaling $2,745).  Handwritten on the bottom of the invoice reads "Hi Vance, Thank You & Merry Christmas."

c.      A December 2015 Gary's Sales invoice issued to ▮▮▮▮▮▮▮▮▮▮ in Hazelwood, Missouri for a $13,046.91 purchase that included an order for 12 boxes of Ashton Double Magnum cigars at $268.00 per box (totaling $3,216) and 12 boxes of Ashton Monarch Tubos cigars at $274.50 a box (totaling $3,294).  Handwritten on the bottom of the invoice reads "Hi ▮ Thank you & Happy New Year."

d.      A 2017 Tinderbox invoice issued to "UAW C/O VANCE PEARSON" for over $1,700 that included a single 400-count humidor for $450 and 10 "Big Stinky Ashtrays" totaling $299.50.

36.     During the review of the RPSH records, agents noted the name of ▮▮▮▮▮▮ on many of the documents originating from the RPSH.  Follow-up with ▮▮▮ disclosed that ▮ was ▮▮▮ of the RPSH ▮▮▮▮▮▮▮▮▮▮▮ interfaced directly with UAW officials ▮▮▮ PEARSON, and ▮▮▮▮▮ with respect to the UAW Region 5 Leadership Conferences.  Jurgens confirmed the "Master Agreement" billing arrangement as described by ▮ and detailed in the sales agreements.  ▮▮▮ added that the arrangement was made at the request of the union.  While invoicing the 2015 conference, ▮▮▮ was approached by ▮ asked ▮▮ to conceal the condominium, villa, meal, golf, and cigar expenses by falsely inflating hotel room rentals on the RPSH invoice.  However, ▮▮ told ▮ that ▮ could not do it because it would be wrong to fraudulently hide the expenses.  Soon thereafter, ▮ approached ▮▮ ▮▮ asked ▮ to lump the expenses together into line items like "outside activities" and "outside housing."  ▮▮ and RPSH agreed to the compromise, but ▮▮ felt personally conflicted, as ▮ believed the purpose of the endeavor was to conceal the true nature of the union's expenditures from its members.

*Coronado, California*

37.     Once agents recognized the fraudulent expenditure of UAW funds in Palm Springs for the Region 5 Conference, they began reviewing other "training" and "conference" expenses related to REGION 5.  Financial records show that between 2014 and 2018, the UAW

10

HQ paid over $200,000, and the UAW's SOUTHWEST CAP paid over $195,000 to the Loews Coronado Bay Resort (Coronado Resort) in Coronado, CA for the UAW Region 5 Community Action Program (CAP) Conference.

38.     Agents have determined that the subject UAW SOUTHWEST CAP funds were paid via check drawn against a checking account ending ▆▆▆ at Enterprise Bank and Trust headquartered in Clayton, MO and located in the EDMO (ABA Routing # 081006162).   The UAW funds were drawn on the EDMI based account previously identified.

39.     Agents obtained the subject vouchers submitted to the UAW's HQ at Solidarity House and determined that they were signed by ▆▆▆ PEARSON, and ▆▆▆ or some combination thereof.  The majority of funds paid to the Coronado Resort by Solidarity House based on the vouchers were made as "advance" payments.

40.     Records from the Coronado Resort indicate that the union had a similar master billing arrangement as the RPSH in that the Coronado Resort was not the ultimate destination of the union funds, but merely a temporary stop.  For example:

41.     Agents found that the Coronado Resort directed over $25,000 in UAW funds to Access Destinations (an event service company) for high-end meals and excursions in 2015 and 2016.  Access Destination records show that the expenses preceded the official meeting dates of the CAP Conference.  The outlay of union funds covered chauffeured transportation to private dining events including purchases of 18-year old Macallan Scotch, Crown Royal Reserve, and other high-end liquor and meal expenses.  Agents also discovered over $2,000 in excursion expenses for senior UAW officials, including ▆▆▆ and their spouses for tickets to the San Diego Zoo's Safari Park as well as horseback riding on the beach.

42.     Additionally, agents discovered the Coronado Resort used UAW advances to pay for over $70,000 to Showtime Golf between 2015 and 2018 for green fees at The Maderas Golf Club, The Grand Del Mar Golf Resort, and The Torrey Pines Golf Club as well as retail purchases at golf course pros shops.  In one example, $4,599.93 of UAW funds was spent at the Grand Del Mar Pro Shop outside the conference dates for clothing and golf equipment, including polo shirts, jackets, ribbon belts, pullover jackets, gloves, hats, shorts, pants, and golf balls.  That same day, the UAW also paid for 2-hour horseback trail rides for five individuals.

*Lake of the Ozarks, Missouri*

43.     Agents have even more recently uncovered a similar pattern of concealed expenses surrounding REGION 5 events in Lake of the Ozarks, MO.   Financial records show that between 2014 and 2018, the UAW HQ in Detroit paid over $300,000, and the MIDWEST CAP paid over $190,000 to the Lodge of Four Seasons (Four Seasons) in Lake Ozark, MO for union events like the Region 5 Retired Workers IAC Training and Region 5 Staff Meetings.

44.     Agents have determined that the subject MIDWEST CAP funds were paid via check drawn against a checking account ending ▆▆▆ at Enterprise Bank and Trust based in Clayton, MO (ABA Routing # 081006162).  The UAW funds were drawn on the previously identified EDMI-based bank account.

11



46.     Agents obtained records from the Four Seasons and determined that the union had a similar arrangement as at the RSPH in Palm Springs and at the Coronado Resort in San Diego, CA. That is to say, the union advanced money to the Four Seasons, and the Four Seasons used that money to offset expenses incurred by senior UAW officials at outside vendors. Agents determined that over $45,000 was spent by the UAW on meals and liquor; over $75,000 on golf green fees, golf merchandise, and accoutrements, including multiple sets of golf clubs; over $3,000 was spent on merchandise like clothing in the hotel store; over $8,000 was spent in spa treatments, and over $1,000 was spent at a local gun range.

*Interviews*

47.     ████████████ was a senior UAW official in the Chrysler Department under ████████ administration. ████ reported to UAW Vice President ████████████ and ████ In June 2017, ████ entered into a cooperation agreement with the government and agreed to enter a felony guilty plea. As part of ██ cooperation agreement, ████ agreed to provide truthful and complete information regarding criminal activity of ████ and others. In and before June of 2017, ████ provided information to federal investigators concerning a multi-year pattern of prohibited payments to union officials, extortion, mail fraud, money laundering, and other criminal activities. Significant portions of the information provided by ██ has been corroborated by bank records, credit card records, text and email communications, records from vendors and other third parties, and interviews with other witnesses. On that basis, ████ is considered a reliable source of information.

49.     ████ told agents that ████ was tasked with shipping ████████ and other UAW officials' golf clubs to Palm Springs, CA in about 2015. ████ was uncertain of the destination or the purpose and began asking other UAW officials to determine where to send the clubs. When ████████ found out about ████ inquiries, ████ called ████ into ████ office and braced ██ with questions on the matter. ████ came to learn that ████ and other senior UAW officials including ████████████ were staying in private villas in a gated Palm Springs community under the pretense that it was for the Region 5 Conference. ████████ directed ██ to keep the matter quiet, as ██ did not want others to know about the arrangements. ████ told agents that the outlay of union funds for such extravagant lodging was inappropriate, served no legitimate union business purpose, and further that there was no reason for these officials to

12

attend the conference. Later, ▆▆▆ learned that senior UAW officials spent months at a time in Palm Springs for the weeklong conference, which ▆▆ characterized as unequivocally wrong. Much of what ▆▆ learned was from conversations with ▆▆▆▆▆▆ who told ▆▆ about the happenings inside the villas in the gated community in 2015 and 2016.



52. ▆▆▆ told agents that ▆▆▆▆▆▆▆▆ PEARSON, ▆▆▆▆ and others spent months in Palms Springs, CA paid for by the UAW or FCA. The UAW officials strung together meetings and conferences in Palm Springs, during which union officials conducted little or no union business, to camouflage the month long stays. ▆▆▆ stated that the aforementioned officials stayed in private condominiums, golfed, dined at lavish restaurants, and otherwise "partied" under the pretense that they were conducting union or labor-management business. In reality, little to no union business was conducted. ▆▆▆ and other similarly situated officials, like PEARSON, were directed by their seniors to outlay UAW and employer funds to cover the expenses. ▆▆▆ recalled an incident where ▆▆ went shopping at the Indian Canyons Golf Resort and when ▆▆▆ got to the checkout, the cashier asked if ▆▆ wanted to put the items on the ▆▆▆ tab. The cashier also told her that ▆▆▆ had spent about $1,000 on ▆▆▆ tab earlier that day purchasing apparel, golf equipment, and other items at the pro shop. ▆▆▆ characterized the activity as wrong and an improper use of union and joint-training funds (depending on which entity paid).

53. Agents interviewed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆ was accompanied by ▆▆ attorney during the interview, and the statements made by ▆▆▆ were subject to a proffer agreement between the government and ▆▆▆, which barred the use of the statements or any evidence derived from the statements against ▆▆▆ ▆▆▆ confirmed that all UAW expenses had to be properly approved and for the benefit of the UAW's membership. ▆▆▆ reviewed excerpts of the transactions detailed above from Palm

13

Springs and the Coronado Resort, and ███ stated that they were outside what ███ would have approved, and that ███ did not know that union funds were being outlaid for such expenses. ███ indicated that the UAW's accounting department cut the checks based on the representation that they were legitimate expenses made for legitimate union conferences. ███ did not believe that the union's LM reports gave an accurate picture of expenses surrounding the UAW Region 5 Leadership Conference and the UAW Region 5 CAP conference based on the vouchers submitted by UAW Region 5.

54.    Agents interviewed ████████████████████████████████████ was accompanied by ███ attorney during the interview, and the statements made by ███ were subject to a proffer agreement between the government and ███████, which barred the use of ███ statements against ████████ ███ indicated that ███ office reviews the UAW vouchers, classifies the payments, and helps prepare the union's LM reports based on the representations made by those union officials requesting/authorizing the payment. ███████ indicated that there is an understanding that union officials are maintaining all applicable records and making good-faith representations on the check requests. ███████ reviewed select expenses from Palm Springs, CA and San Diego, CA detailed above and indicated that ███ had no idea that UAW funds were being used for expenses like cigars, liquor, clothing, and excursions. ███████ stated that any outlay of union funds had to be used for the benefit of the members and that ███ had no knowledge of the union benefit because ███ had no knowledge of the expenses. ███████ confirmed that the source of the funds was the union's bank accounts located within the EDMI and confirmed that all UAW vouchers, including the subject vouchers, were sent via U.S. Mail at Solidarity House in Detroit.

55.    Agents interviewed ████████████████████████████████████████ During the interview, ███████ was accompanied by his attorney, and the statements made by ███████ were subject to a proffer agreement between the government and ███████ which barred the use of the statements or any evidence derived from the statements against ███████ stated that the 'Master Account' billing arrangement at the RPSH was established at ███████ request, and that the purpose of it was to conceal the true nature of how the union money was being spent. ███████ confirmed that ███ submitted false vouchers to the UAW to conceal the expenses at ███████ direction. ███████ stated that ███ and PEARSON were involved in making the arrangements at RPSH and the Coronado Resort at ███████ behest. ███████, also confirmed that union monies were used for purchase of expensive cigars, high-end liquor, fancy meals, nice clothing, and extravagant lodging for high-level union officials and that those expenses were wrong. ███████ witnessed PEARSON and ███████ purchase golf clothing on the ███████ account at the Indian Canyons Golf Resort. ███████ believes that ███ used the events to curry favor with UAW President ███████ who also enjoyed the lavish lifestyle. ███████ stated that union monies were used to secure villas and pay for expenses for retired UAW members to attend and that those members had no legitimate reason to attend the events. ███████ stated that the retirees were simply friends of ███████ and/or ████████ ███ also indicated that this activity began before 2014 and that the UAW and REGION 5 has had similar billing arrangements for some time prior.

14



**Money Laundering and Structuring**

57.    Based on my knowledge, training, and experience, and through consultation with other agents on this and other cases, I know that money laundering is the term given to financial transactions, which are conducted for the purpose of concealing funds, generated by illegal activity. Individuals engaged in laundering illegal funds often flow money through various bank accounts and nominees to avoid detection of law enforcement, conceal the true nature of the transactions, and give those funds the appearance of legitimacy.

58.    As detailed above in paragraph 25, agents identified six checks and one wire drawn on the UAW's bank accounts and issued to the Renaissance Palm Springs Hotel between August 2014 and June 2017. Also as detailed above, the payment originated after fraudulent authorization was obtained based on misrepresentations made by ████ PEARSON, and ████ on UAW vouchers. The senior UAW officials concealed the embezzlement by representing that the payments were advances for legitimate conference expenses surrounding the Region 5 Conference, and that the ultimate destination of the funds was the RPSH.

59.    Agents have identified, at least 40 subsequent payments totaling over $650,000 made by the RPSH (doing business as HHC TRS Portsmouth, LLC) to the outside vendors identified above. These subsequent money-laundering transactions were made at the direction of senior UAW officials, including ████ PEARSON, and ████ and drawn off funds made available through the fraudulent "advances." These payments were undisclosed to the UAW and made to satisfy the lavish personal lifestyles of ████ PEARSON, ████ and other senior UAW officials. A schedule of the subject payments originating from the RPSH bank account are listed below:

15

| Check # | Check Date | Payor | Payee | Amount |
|---|---|---|---|---|
| 8621 | 9/17/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,950.00 |
| 8542 | 9/24/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $7,500.00 |
| 8748 | 10/14/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $1,500.00 |
| 8969 | 11/18/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $19,577.00 |
| 9139 | 12/23/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $44,525.00 |
| 9145 | 12/23/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,825.00 |
| 9205 | 1/7/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $5,175.00 |
| 9374 | 1/27/2015 | HHC TRS Portsmouth, LLC | Indian Canyon's | $6,082.15 |
| 9469 | 2/11/2015 | HHC TRS Portsmouth, LLC | Indian Canyon's | $18,176.30 |
| 10625 | 7/23/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $9,000.00 |
| 10914 | 9/16/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,625.00 |
| 11120 | 10/20/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $28,985.00 |
| 11336 | 11/24/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $47,619.89 |
| 11400 | 12/15/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $5,465.89 |
| 2377 | 1/2/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $1,595.00 |
| 11597 | 1/20/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,046.91 |
| 11605 | 1/20/2016 | HHC TRS Portsmouth, LLC | Johnny Costas | $9,870.05 |
| 11612 | 1/20/2016 | HHC TRS Portsmouth, LLC | LG Prime | $11,284.05 |
| 11632 | 1/20/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $2,634.80 |
| 11661 | 1/27/2016 | HHC TRS Portsmouth, LLC | Home Cleaning | $2,105.00 |
| 11663 | 1/27/2016 | HHC TRS Portsmouth, LLC | Indian Canyon's | $5,024.75 |
| 11666 | 1/27/2016 | HHC TRS Portsmouth, LLC | Johnny Costas | $2,150.27 |
| 12045 | 4/6/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $455.50 |
| 12052 | 4/6/2016 | HHC TRS Portsmouth, LLC | Home Cleaning | $1,175.00 |
| 12055 | 4/6/2016 | HHC TRS Portsmouth, LLC | Indian Canyon's | $16,551.10 |
| 12089 | 4/6/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $134.83 |
| 12689 | 7/6/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $7,334.62 |
| 13541 | 11/2/2016 | HHC TRS Portsmouth, LLC | Holly's Homes | $30,375.00 |
| 13712 | 11/30/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $88,941.00 |
| 13868 | 12/20/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $2,685.00 |
| 13943 | 12/28/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,688.66 |
| 13965 | 12/28/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $1,584.95 |
| 14046 | 1/11/2017 | HHC TRS Portsmouth, LLC | Johnny Costas | $4,371.65 |
| 14104 | 1/18/2017 | HHC TRS Portsmouth, LLC | Indian Canyon's | $4,944.05 |
| 14162 | 1/25/2017 | HHC TRS Portsmouth, LLC | Johnny Costas | $6,120.40 |
| 14252 | 2/8/2017 | HHC TRS Portsmouth, LLC | Indian Canyon's | $14,971.68 |
| 14257 | 2/8/2017 | HHC TRS Portsmouth, LLC | LG Prime | $14,925.80 |
| 55629 | 7/24/2017 | HHC TRS Portsmouth, LLC | Holly's Homes | $28,881.00 |

| 56196 | 11/21/2017 | HHC TRS Portsmouth, LLC | Holly's Homes | $5,585.00 |
| 56200 | 11/21/2017 | HHC TRS Portsmouth, LLC | Desert Princess | $71,422.62 |
| 56473 | 1/22/2018 | HHC TRS Portsmouth, LLC | Tinder Box | $1,720.53 |
| 56501 | 1/26/2018 | HHC TRS Portsmouth, LLC | Indian Canyon's | $19,822.69 |
| 56503 | 1/26/2018 | HHC TRS Portsmouth, LLC | Johnny Costas | $12,352.00 |
| 56519 | 1/26/2018 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,535.62 |
| 57920 | 11/1/2018 | HHC TRS Portsmouth, LLC | Desert Princess | $52,270.00 |
| | | | **TOTAL** | **$660,565.76** |

60.     Agents have also identified similar payments originating from the financial accounts of the Coronado Resort and the Four Seasons.





18



19





21



23



24









**The "Culture of Alcohol"**

85.     During the course of the investigation, agents have developed significant
information concerning the "culture of alcohol" that exists in the senior ranks of the UAW. Said

28

term was first used by UAW official ███████████ during interviews with agents. In those and other interviews, ████████ detailed the outlay of NTC training funds used to purchase significant amounts of liquor and custom-labeled bottles of wine for senior UAW officials including a bottle of Crown Royal Whiskey purchased for ███████ costing $185.

86.    Agents also spoke with vendors to the NTC who were present in Palm Springs, CA for the events and told agents that there was "no limit" on the amount of alcohol they would purchase for requesting union officials. The vendor added that although a conference in Palm Springs was only a few days, the UAW executives stayed for a month or more. The vendor usually took a full semi-truck of luggage and golf clubs for the UAW so they did not have to travel with luggage. The vendor also transported the luggage back to Detroit as well as any luxury items that were purchased in and around Palm Springs by the UAW officials.

87.    Vendor records and testimony obtained from ███████ and others detailed two parties totaling over $50,000 thrown by ███████ funded by the NTC, under the guise that they were dinners for the UAW IEB to showcase the NTC. These events included thousands of dollars of "ultra-premium" liquor, cigars, a torcedor (a person who rolls cigars), and "kandy girls" (provocatively dressed women) to light the cigars for the UAW officials. If that alone were not enough, training funds were also spent on mojito tables and decorations to theme the event like the 1980's hit T.V. show Miami Vice.

88.    As the investigation shifted from investigating the NTC to investigating the UAW proper, the investigators began noticing similar patterns involving the outlay of union funds for alcohol for senior UAW officials. Agents discovered early on that UAW funds sent to the RPSH were used to purchase Crown Royal Reserve at $227 per bottle, Crystal Head Vodka at a $175 per bottle, and Belvedere Vodka at $200 per bottle for conference VIPs.



29



94.     During this investigation, I have been the affiant on multiple other search warrant applications. Two of the subsequent search warrants were executed at the residences of two distinct UAW vice presidents. During those searches, I and other agents found significant amounts of liquor and wine. During one of the searches, the widow of a UAW vice president told us that she and her deceased husband did not drink alcohol. However, agents found multiple boxes containing dozens of bottles of liquor, wine, and other spirits, including items like Crystal Skull and Cîroc Vodka as well as Crown Royal Whiskey. At the search of the other vice president's house, agents seized a wine bottle with a custom-made label bearing his name and the UAW logo all paid for improperly with UAW training center funds.

## Nexus to the Subject Premises

95.     The SUBJECT PREMISES is PEARSON's residence located at **1727 Ciera Ridge Court, St. Charles, MO 63303**.

96.     PEARSON's profile on the UAW's official website (https://uaw.org/ regions/uaw-region-5/director-5/) states that PEARSON resides in St. Charles, MO.

97.     Information provided by            contemporaneous with this warrant application confirms that PEARSON works with him at REGION 5, and that PEARSON currently resides at the SUBJECT PREMISES. This is further supported by internal UAW records obtained in the investigation that detail PEARSON's residence as the SUBJECT PREMISES.

98.     Law enforcement intelligence databases (Accurint, TLOXP, CLEAR) reviewed by agents list PEARSON's current address as the SUBJECT PREMISES. Queries of the State of Missouri's Driver's License (MDL) databases list PEARSON's current address as the SUBJECT PREMISES. National Crime Information Center (NCIC) searches disclosed vehicles registered to PEARSON at the SUBJECT PREMISES.

99. Agents obtained financial records for PEARSON's American Express account as recently as November 2018 and determined the mailing address associated with the account was the SUBJECT PREMISES. Information agents obtained from Bank of America, N.A. disclosed PEARSON purchased a negotiable instrument using over $22,000 in cash in July 2019 and reported to the bank that his address is the SUBJECT PREMISES.

100. In the affidavit above, a conspiracy is detailed involving the embezzlement by PEARSON and others of UAW funds for the purchase of thousands of dollars' worth of golf clubs, golf equipment, golf clothing, cigars, cigar paraphernalia, and high-end bottles of liquor. Based on my experience and knowledge of this investigation, I believe that PEARSON and the other members of the conspiracy store these items at their respective homes, including at the SUBJECT PREMISES.

101. To support that statement, I submit that investigating agents have personally observed dozens, if not hundreds, of golf items (including clothing) at searches of two other similarly situated UAW officers' residences. As detailed above, agents also found hordes of alcohol containing many of the same brands detailed in this affidavit and in Attachment B.



103. Finally, I know through my training and experience that individuals involved in money crimes oftentimes keep criminal proceeds like cash in close proximity to their person and at locations like the SUBJECT PREMISES. In my experience, this is particularly true when individuals or their conspirators are under overt investigation (and, in this case, overt media scrutiny). Such individuals may wish to avoid using regular financial institutions to store or transfer funds, but instead use cash to avoid creating a financial footprint and to hide criminal proceeds from law enforcement.

## Computers and Electronic Storage

104. As described above and in Attachments A & B, this application seeks permission to search and seize records that might be found on the SUBJECT PREMISES, in whatever form they are found. I submit that if a computer or electronic medium is found on the premises, there is probable cause to believe those records will be stored in that computer or electronic medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily available

31

forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Based on actual inspection of UAW vouchers and emails, I am aware that computer equipment was used to generate and transmit documents used in the schemes detailed above.

105.    I know that when an individual uses a computer to send emails and prepare documents in an embezzlement scheme or uses their telephone to obstruct justice, the individual's computer or phone will generally serve both as an instrumentality for committing the crime, and also as a storage device for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer and/or the phone is also likely to be a storage device for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of discussions about the crime; and other records that indicate the nature of the offense.

106.    Because several people share the SUBJECT PREMISES, it is possible that the SUBJECT PREMISES will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on those computers, this application seeks permission to search and if necessary to seize those computers as well. It may be impossible to determine, on scene, which computers contain the things described in this warrant.

107.    Based upon my knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

a.      The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This

sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.     Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search processes are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

108.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

109.     Searching computer systems for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the U.S. Department of Labor, the Federal Bureau of Investigation, and the Internal Revenue Service intend to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

**Conclusion**



33

## **Request for Sealing**

111.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. The documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Andrew Donohue
Special Agent
U.S. Department of Labor –
Office of Inspector General

Subscribed and sworn to before me and signed in my presence and/or by reliable electronic means.

JOHN M. BODENHAUSEN
United States Magistrate Judge

Dated: 8/21/19

34

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the residence located at ▮▮▮▮▮▮▮▮▮▮ **St. Charles, MO 63303**, and any computers or e▮▮▮▮▮▮▮▮ d▮▮▮▮▮▮ contained therein that are capable of housing



*Figure 1:* ▮▮▮▮▮▮▮▮▮▮▮▮



*Figure 2: South face and driveway of* ▮▮▮▮▮▮▮▮▮▮

1

## ATTACHMENT B

### Particular Things to be Seized

1.     For the period **January 1, 2011**, to the present, evidence relating to one or more violations of **29 U.S.C. § 501(c) (Embezzlement of Union Funds or Assets), 29 U.S.C. § 439(b) (Filing False LM Reports), 29 U.S.C. § 439(c) (False Union Records), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud)** or conspiracy to commit the same, or property designed or intended for use in committing such crimes, including photographs, calendars, schedule books, quantities of United States currency in excess of $1,000 or quantities of foreign, virtual, or internet currency or precious metals with a value in excess of $1,000 USD, receipts, payment records, ATM records, cancelled checks, wire transfer records, cashier's checks, money orders, payroll records, credit card receipts, wage records, bank records, union records including vouchers and attachments, tax designation records and other records including IRS Forms W-2 and 1099, federal, state or city tax returns and tax records or any similar records or physical items which constitute, refer or relate to false entries on UAW records and LM Reports and funds or assets embezzled from the UAW, by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ VANCE PEARSON, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or other UAW officials or conspirators along with notes, correspondence, or communications which refer or relate to any such activities.

2.     For the period **June 1, 2011** to the present, evidence relating to one or more violations of **18 U.S.C. § 1956 and 18 U.S.C. § 1957**, and conspiracy to commit the same, as well as property designed or intended for use in committing such crimes including receipts, ledgers, accounting records, financial statements, asset acquisition records, deed and title records, closing or refinance packages, bank statements, checks, bank deposit records, bank withdrawal records, certificates of deposit, investment account records, cashier's checks, money orders, wire transfer records, credit card, debit card or charge card records, foreign bank account records, virtual currency records or internet based currency records, identification documents in any assumed or alias name(s), travel records, safe deposit box records, safe deposit box keys, quantities of United States currency in excess of $1,000 or quantities of foreign currency or precious metals with a value in excess of $1,000 USD, along with records which constitute, refer or relate to the commingling of criminal proceeds with noncriminal proceeds including wage records, IRS Forms W-2 and 1099-MISC, federal, state or city tax returns and tax records, to include any such evidence contained in any safes, fire boxes or strong boxes.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.     Golf clubs, golf equipment, clothing, and golf accoutrements paid for with funds or assets embezzled from the UAW, and all relevant records including indicia of ownership. All photographs or other images reflecting ones ownership or possession of any of the items listed in this paragraph or accompanying tables. Items consistent with those listed on golf course and pro-shop receipts used in the scheme, including branded items from companies listed in the table below.

2

| Brands of Golf Equipment, Clothing, and Accoutrements: | | | |
|---|---|---|---|
| Adidas | EP Pro | Nike | Spanner |
| Ahead | Fairway and Green (F&G) | Oakley | Straight Down |
| Annika Collection | Footjoy (FJ) | Oxford | Sun Mountain |
| Antigua | Greg Norman | Peter Millar | Sunice |
| Ashworth | Hollas | Pinnacle | Titleist |
| Callaway | Jamie Sadock | Polo | Tommy Bahama |
| Color Your World | K.Bell | Pukka | Travis Mathew |
| Cutter & Buck | Legendary | Ralph Lauren | Under Armour |
| Daily Sports | Maui Jim | San Soleil | Volvik |
| DKNY | Maxx | Second Skin | Zero Restriction (ZR) |

5.     Golf implements, clothing, accoutrements, and regalia, paid for with funds embezzled from the UAW, and branded with indicia from **The Club at Porto Cima, Torrey Pines, Maderas, Thousand Hills, Indian Canyons, Buffalo Ridge, Branson Hills (formerly Payne Stewart Golf Club), Big Cedar Lodge, and Grand Del Mar**.

6.     Cigars and related paraphernalia, paid for with embezzled UAW funds, and all relevant records including indicia of ownership. Including items from **Crown City Cigars and Fine Tobacco, Gary's Sales, and Tinderbox** as identified in the investigation and used in the scheme. Including those cigars and paraphernalia listed in the tables below:

| Cigars: | |
|---|---|
| Alec Bradley Tempes Medius 6 | DTT Sobremesa Short Churchill |
| Arturo Fuente Anejo Reserve #49 | Foundry Lovelace |
| Arturo Fuente Rothschild | JFR Maduro |
| Ashton Churchill | La Palina Mr. Sam Robusto |
| Ashton Double Magnum | Maker's Mark |
| Ashton Monarch Tubos | Olivia NUB 460 Cameroon |
| Black Dahlia Gran Robusto | Perdomo 10th Anniversary Champaign Robusto |
| CAO Moontrance Corona | Recluse Connecticut |
| Corona Double Dominican | Rocky Patel 1999 Connecticut Robusto |
| Diamond Crown Churchill | Romeo Y Julieta |
| | Room 101 Ltd Conjura |

3

| Cigar Paraphernalia: | |
| --- | --- |
| 400 Count Humidors | Macassar Humidors - Medium Rosewood |
| Big Stinky Ashtrays | Quad Stainless Steel(SS) Table Cutters |
| Burl Square Ashtrays | Scout Travel Humidors |
| Carbon Fiber Cigar Tubes | Silver Stinky Ashtrays |
| Cigar Caddy - 10 count | SS Silver Cigar Tubes |
| Cigar Save it Tubes | Vector Nitro Torch Silver |
| Craftsman's Bench 60R Robusto cases | Vector SS V Cutters |
| Craftsman's Bench 60R Churchill cases | Vegas 5 Humidors |
| Craftsman's Bench V-Cutters | Water Pillows |
| Craftsman's Bench Guillotine | XIKAR 100 Count Humidification |
| Digital Hydrometers | XIKAR 15count Cigar Caddy |
| Hamlet Old Glory 100 Count Humidors | XIKAR 250 Count Humidification |
| Hamlet Old World 100 Count Humidors | XIKAR Aluminum SS Cutters |
| Jetline Quad Lighters | XIKAR Bricks 250 Count |
| Jetline Triple Lighters | XIKAR Large Humidification Bottles |
| Macassar Humidors - Large | XIKAR Premix Solution |
| Man-O-War Humidors | XIKAR Travel Caddys |

7.     Liquor and related paraphernalia, paid for with embezzled UAW funds, and all
relevant records including indicia of ownership. Including ill-gotten items identified by the
investigation from **Markham Vineyards** and **Grapevine Wines, Eddie V's, and Mister A's**,
which include items or the **premium or ultra-premium versions, and related collectable
glassware** of the items listed in the table below:

| Alcohol: | |
| --- | --- |
| Belvedere Vodka | Hennessy Cognac |
| Beringer White Zinfandel | Jose Cuervo Gold Tequila |
| Canadian Club Whiskey | Liberated Cabernet |
| Captain Morgan Rum | Louis the 13th Cognac |
| Crown Royal Whiskey | Macallan Scotch |
| Crystal Champagne, | Makers Mark Whiskey |
| Crystal Head Vodka | Mondavi Chardonnay |
| Don Julio Tequila | Seagram's Whiskey |
| Gozio Amaretto | Snowqueen Vodka |
| Grey Goose Vodka | Wild Turkey Whiskey |

8.     Records, photos, and items related to spa purchases, paid for with embezzled
UAW funds, and all relevant records. Including spa related items identified by the investigation
from **Spa Shiki** including **Himalayan Salt Stones, Moroccan Oil Shampoo,** a **Biodynamic
Collection Gift Box,** or **Paraffin Foot Wax**.

4

9.      Records, photos, and items related to lodging or accommodations, paid for with embezzled UAW funds, and all relevant records.  Including photos, calendars, schedule books, travel records, communications relating to condominium and villa purchases at **Desert Princess Rentals** and **Holly Holmes**.

10.     **Shipping records** and **manifests** relating to the offenses described on the warrant.

11.     Any **computers, phones, or electronic media** that were or may have been used as a means to commit the offenses described on the warrant.